IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 2:10-CR-152-DCN |
| vs. | ) | |
| | ) | |
| ELIJAH ELDON HEARNS, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on defendant's motion to suppress. Defendant moves to suppress approximately seven ounces of marijuana and twelve pounds of Ecstasy seized from the car he was driving following a traffic stop conducted by the South Carolina Highway Patrol (SCHP) on January 20, 2010. The government filed a response in opposition on August 16, 2010, and a suppression hearing was held on August 18, 2010. For the reasons set forth below, the court denies defendant's motion.

## I.  BACKGROUND

On January 20, 2010, Corporal Christian Logdon, SCHP, conducted a traffic stop on the Nissan Altima driven by defendant after observing the Altima following too closely to a tractor-trailer on Interstate 95. Subsequent to a drug dog ("K-9") sweep and search of the vehicle, officers seized approximately seven ounces of marijuana and twelve pounds of Ecstasy from a hidden compartment inside the car's trunk. Defendant moves to suppress the drugs, arguing: (1) there was no objective basis for the traffic stop; therefore, the traffic stop was merely a pretext to search for evidence of other criminal activity; (2) defendant did not consent to the search, and the search did not fall under any

1

other exception to the search warrant requirement; (3) even if defendant had consented to the search of his car, Corporal Logdon's use of a drug-detecting dog would have exceeded the scope of defendant's consent; (4) the government has failed to show that the K-9 sweep of the car was based on probable cause or reasonable suspicion, and likewise, it has not produced any evidence of the dog's certification or training; and (5) the traffic stop ended prior to Corporal Logdon's request for a K-9 sweep of the vehicle.

In response, the government argues that Corporal Logdon saw defendant commit a traffic violation, justifying the stop, and that Corporal Logdon developed reasonable suspicion of criminal activity after the stop took place. The government also argues that the traffic stop and search of defendant's car were lawful because Corporal Logdon had defendant's consent to and reasonable suspicion for the prolonged stop and consent to and probable cause for the search. In addition, the government claims that the K-9 sweep did not exceed the scope of the consent given, and the dog used in the traffic stop was properly trained and certified.

During the suppression hearing on August 18, 2010, Corporal Logdon and Lance Corporal Steven English testified, providing the following details about the traffic stop and K-9 sweep. According to Corporal Logdon, he saw the Altima approximately one-half of a car length from the rear of a tractor-trailer traveling southbound on Interstate 95. After activating his blue lights and stopping the Altima, Corporal Logdon approached the passenger side of the car.

Defendant was the sole occupant of the vehicle, and Corporal Logdon noticed a strong chemical odor[1] emanating from the car's interior as he spoke with defendant through the open front passenger window. At that time, Corporal Logdon saw three "5-hour Energy" bottles, a caffeinated green tea container, and a "Muscle Milk" container on the front passenger floorboard. Corporal Logdon observed a single key in the ignition, with only a remote fob and another key on the key ring. In addition, there was a backpack and a jacket in the back seat and an unknown amount of United States currency, which appeared to be in $20 denominations, in the center console.

When asked for his license and registration, defendant gave Corporal Logdon an Ontario, Canada driver's license. Defendant then began looking through a stack of papers for the car's registration. Corporal Logdon testified that defendant stated the car belonged to a friend. Defendant took an Enterprise Rent-A-Car rental agreement from the stack of papers and handed it to Corporal Logdon. Corporal Logdon noticed that the rental agreement was not related to the Nissan Altima and asked defendant if the car was a rental. Corporal Logdon said that defendant seemed surprised by the question, and he allegedly stated that he did not think he was driving a rental car, but it was possible that it could be a rental car.[2] Since it was unclear who owned the vehicle, Corporal Logdon

---

[1]Corporal Logdon described the odor as similar to the odor of Bondo, fresh paint, or silicone. Corporal Logdon also testified that he walked around the exterior of the car during the stop and did not notice any recent body work that could have been associated with the odor.

[2]Corporal Logdon acknowledged during his testimony that an individual must be twenty-five years of age to rent a car in Canada, and defendant was twenty-four years old at the time of the car stop.

sought to determine whether it was stolen. He requested that defendant step out of the car, so that he could better hear defendant and ascertain who owned the vehicle.[3]

When asked how he came to be driving the car, defendant told Corporal Logdon that he borrowed the Altima from a friend named Jason, and Jason had borrowed the car from his (Jason's) girlfriend. Defendant did not know the girlfriend's name. Defendant explained that Jason traveled from Ontario, Canada, to Chicago, Illinois, and picked up his girlfriend's car. Jason then drove the car to Syracuse, New York, where he met defendant and gave him the car. Defendant stated that another friend drove from Ontario, Canada, to Syracuse, New York, to pick up Jason and take him back to Canada. Defendant told Corporal Logdon that he had traveled from Ontario, Canada, to Syracuse, New York, and that he was on his way to Florida, where he was planning to stay with a female cousin for several days. Defendant said that he needed to borrow a car because his car was in no condition to make the trip.

While both Corporal Logdon and defendant were standing in front of Corporal Logdon's police car, which was behind defendant's car, Corporal Logdon noticed defendant fidgeting with his sunglasses, walking somewhat in circles, and occasionally glancing back at the Altima. Corporal Logdon also saw that defendant's eyes were bloodshot. According to Corporal Lodgon, defendant agreed that he should not have been following the tractor-trailer so closely, and Corporal Logdon wrote defendant a

---

[3]During cross-examination, Corporal Logdon testified that he learned the car was registered to a Maria Dining prior to issuing defendant a warning ticket for following too closely. Defendant provided a valid insurance card in the same name to Corporal Logdon.

warning ticket for the traffic violation.

After returning defendant's driver's license and related paperwork, but before giving a copy of the warning ticket to defendant, Corporal Logdon asked defendant for consent to search the car. Corporal Logdon testified that he wanted to search the car because he suspected that defendant may have been involved in criminal activity. Defendant said that he needed to continue on his trip. When pressed for a yes or no answer, defendant said no, he would not consent to a search. Corporal Logdon began to radio for a K-9 officer, Lance Corporal English. Before he could complete the radio call, defendant said that Corporal Logdon could go ahead and search the car. Corporal Logdon continued the call for a K-9 because he did not want defendant to feel coerced into giving consent. Corporal Logdon explained to defendant that he called for a K-9 to conduct a sweep around the exterior of the car, and that if the dog alerted to any portion of the car, the alert would provide Corporal Logdon with probable cause to search the car. According to Corporal Logdon, defendant verbally agreed to Corporal Logdon's course of action, and he did not attempt to limit the scope of the K-9 sweep in any way.

Corporal Logdon testified that Lance Corporal English and his drug detection dog, Sky, arrived within twenty to twenty-five minutes. As Lance Corporal English and Sky walked around the Altima, Sky jumped through the open front passenger window into the car and alerted to the back seat. Corporal Logdon and Lance Corporal English conducted a search of the vehicle following the K-9 alert. Corporal Logdon testified that the chemical odor inside the car was overwhelming, and once they removed the back seat, he observed metal shavings and scratches underneath. Corporal Logdon stated that the

support cross-bars behind the seats appeared to have been cut with a torch because burn marks were visible and a section appeared to be missing from the cross-bars. The officers then looked in the trunk, which according to Corporal Logdon, seemed smaller than normal. Once they removed the unbolted spare tire, Corporal Logdon noticed fresh paint and silicone. The officers then discovered a manufactured compartment constructed above the original floor of the trunk. They pried the compartment open and discovered a hydraulic piston inside. The compartment contained approximately seven ounces of marijuana in heat-sealed bags and approximately twelve pounds of multi-colored Ecstasy pills in heat-sealed bags. The officers placed then defendant under arrest. Corporal Lodgon testified that the camera in his police car recorded the entire traffic stop; however, the videotape in the recorder malfunctioned. The resulting video of the traffic stop can only be played in fast-forward, without audio.

Lance Corporal Steven English testified that he was first certified as a K-9 handler with Sky in March 2009 by Corporal Mark Howard, who is the SCHP's Master K-9 Handler. Lance Corporal English stated that Sky was certified in December 2008, and re-certified in December 2009. Sky is currently certified to detect marijuana and cocaine, but she has previously been certified to detect heroin, methamphetamine, and crack cocaine.[4] Lance Corporal English stated that he and Sky perform maintenance training approximately once or twice per month with Corporal Howard in Columbia, South Carolina. Lance Corporal English said that he has maintenance training records for Sky

---

[4] Lance Corporal English explained that the K-9 drug certifications are dependent on the SCHP-seized drug exhibits available to the Master K-9 Handler at the time of certification.

dating back to at least 2007.

Lance Corporal English testified that when he and Sky conducted an exterior sweep of defendant's car, he first noticed a behavior change in Sky, a change in her breathing,[5] indicating a positive alert to the odor of drugs. Sky immediately jumped through the open front passenger window as Lance Corporal English began to walk around the front of the Altima. Once inside the car, Sky began to bite and scratch at the back seats.

Lance Corporal English testified that he smelled the Bondo odor inside the car. He also saw metal shavings and yellow spray insulation between the upper and lower back seat cushions. He stated that these items were inconsistent with an unaltered, factory-manufactured car. In addition, Lance Corporal English verified that he and Corporal Logdon found a manufactured compartment built on top of the original trunk floor, and the compartment contained large quantities of marijuana and Ecstasy.

## II. DISCUSSION

The Supreme Court has determined that a routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment. See Delaware v. Prouse, 440 U.S. 648, 653 (1979). "An ordinary traffic stop is, however, a limited seizure more like an investigative detention than a custodial arrest." United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) (citation omitted). Courts use the analysis for investigative detention announced in Terry v. Ohio, 392 U.S. 1 (1968), to determine the scope of police authority

---

[5]Lance Corporal English testified that being able to notice changes in a K-9's behavior is part of the drug detection certification process.

in traffic stops. Id. (citation omitted). A court should consider the dual inquiry of "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. (citations omitted).

In United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993), the Fourth Circuit adopted the "objective test," which finds no "intrusion upon the Fourth Amendment" if "an officer has probable cause or a reasonable suspicion to stop a vehicle." The court quoted language from United States v. Cummins, 920 F.2d 498, 500-01 (8th Cir. 1990), in support of this holding:

> When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle . . . . [T]his otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity . . . . [T]hat stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.

Hassan El, 5 F.3d at 730. "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. See, e.g., [Illinois v. Caballes, 543 U.S. 405, 407 (2005); Whren v. United States, 517 U.S. 806, 810 (1996); United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004)]." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008).

The Fourth Circuit has held that "[i]f the initial stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the 'fruit of the poisonous tree doctrine.'" Rusher, 966 F.2d at 875 (citations omitted). Following Terry,

8

the law has become well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. Id. at 876-77. According to the Fourth Circuit,

> When a driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime.

Id. (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988) (citing Florida v. Royer, 460 U.S. 491, 498-99 (1983); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)). The Supreme Court has held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977).

With regard to allegations that a traffic stop was performed as a mere pretext to discover evidence of other crimes, the Supreme Court has held that an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren, 517 U.S. at 813. "If an officer has probable cause or reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." Hassan El, 5 F.3d at 730.

South Carolina Code of Laws § 59-5-1930(a) requires that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Corporal Logdon testified that he personally observed defendant driving the Nissan Altima approximately one-half of a car length behind a tractor trailer, in a position where the driver of the tractor-trailer would not have been able to see the Altima in the tractor-trailer's side-view mirrors. Corporal Logdon also testified that defendant agreed that he had been following the tractor-trailer too closely. Defendant did not submit any evidence contradicting Corporal Logdon's testimony. Corporal Logdon saw defendant commit a traffic violation; therefore, he had probable cause to stop the Altima driven by defendant. Although defendant argues in his brief that the traffic stop was merely a pretext to search for evidence of criminal activity, defendant did not present testimony or evidence during the suppression hearing to support such a conclusion. Even if such testimony or evidence existed, it would still not negate the probable cause to stop the car driven by defendant based on Corporal Logdon's observation of the traffic violation.

The end of a traffic stop does not automatically signal the beginning of an unconstitutional seizure. See United States v. Farrior, 535 F.3d 210, 218 (4th Cir. 2008). "A 'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" Id. (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). If there is no seizure, then an encounter is consensual "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business.'"

Id. (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson --- U.S. ---,129 S. Ct. 781, 788 (2009) (citation omitted).

Additionally, a consensual search does not violate the Fourth Amendment. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). If a prosecutor is relying on consent to justify the lawfulness of the search, the burden is on the government to prove consent was freely and voluntarily given. Id. at 222. Courts should assess the totality of the circumstances in determining whether consent was voluntary. Id. at 226. Voluntariness takes into account "evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights." Id. at 248. The subject's knowledge of the right to refuse is a factor to be taken into account. Id. at 249. Factors to look at in determining whether the encounter was consensual also include,

> the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon, and the physical touching by the police of the citizen.

United States v. Weaver, 282 F.3d 302, 310 (4th Cir. 2002) (citations omitted). Additionally, "retention of a citizen's identification or other personal property or effects is highly material under the totality of the circumstances analysis." Id. (citation omitted).

"A seizure that is justified solely by the interest in issuing a warning ticket to a driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Caballes, 543 U.S. at 407.

> If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place. See [Royer, 460 U.S. at 500 ]. Thus, a prolonged automobile stop requires either the driver's consent or a "reasonable suspicion" that illegal activity is afoot. See Foreman, 369 F.3d at 781; see also [Royer, 460 U.S. at 500-01]; 4 Wayne R. LaFave, Search and Seizure § 9.3(f), at 399. While a precise articulation of what constitutes "reasonable suspicion" is "not possible," [Ornelas v. United States, 517 U.S. 690, 695 (1996)], the precedents of the Supreme Court and this circuit suggest several principles that should animate any judicial evaluation of an investigatory detention pursuant to Terry.

Branch, 537 F.3d at 336. First, reasonable suspicion is a much less demanding standard than that required for probable cause. Id. "Indeed, in order to justify a Terry stop, a police officer must simply point to 'specific and articulable facts which, taken together with rational inferences from those facts,' [Terry, 392 U.S. at 21], evince 'more than an "inchoate and unparticularized suspicion or hunch" of criminal activity.' [Illinois v.Wardlow, 528 U.S. 119, 124 (2000) (quoting Terry, 392 U.S. at 27 (internal quotations omitted))]." Id. Second, "the Supreme Court has noted that 'reasonable suspicion' is a 'nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Ornelas, 517 U.S. at 695] (internal quotations omitted)." Id. Third,

> Courts must look at the "cumulative information available" to the officer, [United States v. Arvizu, 534 U.S. 266, 273 (2002)], and not find a stop

> unjustified based merely on a "piecemeal refutation of each individual" fact and inference, [United States v. Whitehead, 849 F.2d 849, 858 (4th Cir. 1988)]. A set of factors, each of which was individually "quite consistent with innocent travel," could still, "taken together," produce a "reasonable suspicion" of criminal activity. [United States v. Sokolow, 490 U.S. 1, 9 (1989)]. "It is the entire mosaic that counts, not single tiles." Whitehead, 849 F.2d at 858.

Id. at 337. And fourth, "a police officer's decision to stop and detain an individual must be evaluated objectively. See, e.g., [Wardlow, 528 U.S. at 123; Terry, 392 at 21-22]." Id.

When Corporal Logdon first asked defendant for consent to search the Altima, defendant said no; clearly there was no consent to search the car at this point during the traffic stop. Corporal Logdon testified that defendant later changed his mind and gave consent, yet the court finds it unlikely that defendant would have freely and voluntarily consented to a search of the car for several reasons. First, Corporal Logdon admitted that defendant was not free to leave when first asked for consent to search the car; Corporal Logdon had already decided to detain defendant and call for a K-9. Second, Corporal Logdon had returned defendant's driver's license and related paperwork; however, he did not physically hand defendant a copy of the warning ticket. Defendant would not have been allowed to leave without receiving the warning ticket. Third, Corporal Logdon testified that he continued to call for a K-9 after defendant later consented to a search of the car because Corporal Logdon was concerned about whether defendant felt coerced into giving consent. Based on these facts, the court finds that defendant did not give valid consent to search the car.

This determination, however, does not end the court's inquiry into the validity of the resulting search. The court must next look to whether Corporal Logdon was justified in prolonging the traffic stop by requesting a K-9, and if so, whether he then had probable cause to search the car. Based upon the aforementioned principles found in Supreme Court and Fourth Circuit precedent, the court must determine whether Corporal Logdon had an objective, reasonable suspicion of criminal activity based on the totality of the circumstances he perceived during the traffic stop.

Corporal Logdon testified that he had a reasonable suspicion to believe that defendant may be involved in some form of criminal activity by the time Corporal Logdon first asked defendant for consent to search the Altima. Corporal Logdon testified that based on his training and experience, the following observations, in combination, gave rise to a suspicion of criminal activity, particularly that of someone acting as a drug courier: multiple "5-hour Energy" drinks, a caffeinated green tea container, and a "Muscle Milk" container on the front passenger floorboard; a strong chemical odor similar to Bondo, paint, or silicone coming from inside the car with no corresponding indicia of any body work being done on the car; defendant's lack of knowledge regarding the owner of the Altima; defendant's lack of knowledge regarding whether the car was a rental vehicle; the presence of only two keys and a key fob on defendant's key ring; the presence of an unknown quantity of United States currency in the center console; the presence of only a jacket and a backpack on the back seat of the Altima; the highly unusual story regarding how defendant came to possess the vehicle, involving travel by other persons from Ontario, Canada, to

Chicago, Illinois, to Syracuse, New York, just so that defendant could use the car to visit a female cousin in Florida for several days;[6] defendant's nervous behavior, including glances toward the Altima, while he was standing in front of Corporal Logdon's police car; and defendant's bloodshot eyes. Any of these items or behaviors, alone, may not indicate anything out of the ordinary, but viewed in combination, they may reasonably lead a trained police officer to suspect that defendant was involved in transporting contraband in an altered vehicle over long distances, attempting to make few, if any, stops along the way. The court finds that Corporal Logdon's observations support the formulation of the reasonable suspicion necessary for Corporal Logdon's continued detention of defendant until Lance Corporal English and Sky arrived and conducted an exterior K-9 sweep of the Altima.

"[T]he use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' [United States v. Place, 462 U.S. 696, 707 (1983)]—during a lawful traffic stop, generally does not implicate legitimate privacy interests." Caballes, 543 U.S. at 409 ("In this case, the dog sniff was performed on the exterior of respondent's car while

---

[6]Neither the pleadings nor witness testimony identified defendant's home city in Ontario, Canada, or from which city in Ontario Jason's friend traveled. For illustration purposes, using Toronto, Ontario, Canada, as a starting point yields the following results. According to Rand McNally, http://maps.randmcnally.com, the distance between Toronto, Ontario, Canada, and Chicago, Illinois, is 521 miles. The distance between Chicago and Syracuse, New York, is 680.5 miles, and a one-way return trip from Syracuse to Toronto covers a distance of 244.4 miles. The defendant stated that someone traveled from Ontario to Syracuse to take Jason back to Ontario. Thus, according to defendant, Jason and another individual had to travel a total of 1,690.3 miles just so defendant could borrow the Altima to travel to Florida for a several-day visit.

he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement."); Branch, 537 F.3d at 335-36 ("[A] dog sniff is not a search within the meaning of the Fourth Amendment, and it therefore requires no additional justification.") (citing Caballes, 543 U.S. at 407, 410; Place, 462 U.S. at 707).

"The detection of narcotics by a trained dog is generally sufficient to establish probable cause." United States v. Robinson, 707 F.2d 811, 815 (4th Cir. 1983); see also United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed.").

> Of course, implicit in our statement in Robinson is the assumption that a drug dog's positive alert for contraband must possess some indicia of reliability for the alert to establish probable cause. Our sister circuits have held that a search warrant based on a positive alert by a drug dog is sufficient on its face to establish probable cause if the affidavit supporting the warrant states that the dog is trained and certified to detect controlled substances. See, e.g., United States v. Kennedy, 131 F.3d 1371, 1376-77 (10th Cir. 1997) ("As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics."); United States v. Berry, 90 F.3d 148, 153 (6th Cir. 1996) (holding that an affidavit need not describe the particulars of the dog's training; an affidavit's description of a drug dog's positive alert for controlled substances coupled with a reference to the dog's training in narcotics investigations is enough to establish probable cause); United States v. Klein, 626 F.2d 22, 27 (7th Cir. 1980) (holding that a statement that a dog graduated from training class and has proven reliable in detecting drugs on prior occasions is sufficient to support probable cause).

United States v. Koon Chung Wu, No. 06-4172, 2007 WL 412169, at *5 (4th Cir. Feb. 2, 2007). In Koon Chung Wu, the Fourth Circuit found that aside from accounts

of a K-9's positive alerts on packages containing drugs, affidavits describing the K-9's drug detection training and certification (and re-certification) sufficed to establish the K-9's reliability. Id.

The use of Sky to conduct an exterior sweep of defendant's car did not constitute a search under the Fourth Amendment, and Sky's vigorous alert provided the probable cause necessary for the officers to search the vehicle. Although defendant raised arguments concerning the reliability of Sky, defendant did not offer testimony or evidence to refute Lance Corporal English's testimony regarding SCHP Master K-9 Handler Howard's annual certifications of Sky since December 2008. Lance Corporal English testified that in December 2009, approximately one month prior to the traffic stop in question, Sky was certified to detect marijuana and cocaine. During the traffic stop, Sky alerted to the back seats of the car driven by defendant, and officers discovered marijuana, along with Ecstasy, in a hidden compartment in the trunk.

Lance Corporal English testified that he was first certified to work as Sky's handler in March 2009. Lance Corporal English also testified that he possesses maintenance training records for Sky dating back to at least 2007, and he performs maintenance training with her, under the supervision of Corporal Howard, once or twice per month. The court finds that Lance Corporal English's testimony regarding Sky's certifications and routine training adequately establishes her reliability. Thus, her positive alert to the back seats of the car provided the probable cause necessary for the search.

## III. CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to suppress.

**AND IT IS SO ORDERED**.

```
_____
```
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**October 13, 2010**
**Charleston, South Carolina**